LAW OFFICES OF JASON T. CONFORTI
Jason Conforti, SBN 265627
550 West C Street, Suite
San Diego, CA 92101
Tel.: (619) 274-8036
Fax: (619) 231-2002
JTC@JasonConforti.com

LAW OFFICES OF MICHAEL ANTHONY HERNANDEZ
Michael Anthony Hernandez, SBN 234579
402 W. Broadway, Suite 1720
San Diego, CA 92101
Tel.: (619) 341-3149
Fax: (619) 996-2200
Michael@DefenseAttorneySD.com

Attorneys for Defendant
Benjamin Madrigal

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF CALIFORNIA
### (Hon. Dana M. Sabraw)

|  |  |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　Plaintiff,<br><br>v.<br><br>BENJAMIN MADRIGAL,<br><br>　　　Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CASE NO. 23cr1684-DMS

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF MOTION TO SUPPRESS STATEMENTS**

　　　Defendant, Benjamin Madrigal, by and through his attorneys of record, hereby moves this Court to suppress his statements obtained by law enforcement in violation of the United States Constitution and international law. This motion is based on the facts and circumstances described herein, testimony that will be elicited at the hearing on this matter, the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, Article 36 of the Vienna Convention on Consular Relations, and domestic and international law cited below.

## I.    <u>STATEMENT OF RELEVANT FACTS</u>

Benjamin Madrigal first arrived in the United States in late 2020 – just 19 years old – seeking refuge from the violence that had already claimed the lives of two older brothers in Jalisco, Mexico.  He first arrived in Phoenix, Arizona, and made his way to Portland, Oregon where he took up work as a roofer.  When the work dried up there, he relocated to Redding, California, and later to Visalia, California.  He resided for a while in Yakima, Washington, then relocated to the Fresno, California area.

On or about May 12, 2021, Mr. Madrigal was arrested by Oregon State Police as a passenger in a car driven by Daniel Ponce, and laden with a large quantity of narcotics.  On June 19, 2021, he was granted release on bond and ordered to appear in court on July 19, 2021.   When he failed to appear in court as required, a warrant was issued on August 6, 2021.  By November 28, 2021, state prosecutors moved to dismiss the state case against Mr. Madrigal on the basis of a pending federal prosecution of the matter, and on November 29, 2021, Oregon Circuit Court Judge Adkissor ordered the state case dismissed.

By early 2023, Mr. Madrigal had relocated to the Fresno, California area.  On or about April 4, 2023, HSI San Francisco Special Response Team executed a search warrant at 19161 Goodfellow Avenue in Reedley, California.  During the execution of the search warrant Benjamin Madrigal, a 21 year-old Mexican national and citizen,  exited the home via a back window.  As he ran near a neighboring house, he was tackled to the ground and apprehended by law enforcement officers.

During his apprehension, Mr. Madrigal struck his head on the hard ground, and he informed investigating officers of his injury.   As Mr. Madrigal was wearing only his underwear at the time of his apprehension, the agents were able to observe his body, and noticed scratches on Mr. Madrigal's unclad body.  Despite the injury, investigating agents, including Travis Desmond, continued their efforts to elicit a statement from Mr. Madrigal.

Travis Desmond, The primary investigating agent, did not speak Spanish, nor did his partner Nick. A third agent was present and served as an interpreter.

Mr. Madrigal's interrogation took place in the "interrogation room inside a law enforcement communications vehicle in Reedley, California." (Reports 4163-R).

# ARGUMENT

## I.    LAW ENFORCEMENT DID NOT ADEQUATELY ADVISE MR. MADRIGAL OF HIS RIGHTS AND MR. MADRIGAL DID NOT GIVE A VOLUNTARY, KNOWING AND INTELLIGENT WAIVER OF HIS MIRANDA RIGHTS

### A.    The Prosecution Bears the Burden of Proving a Valid Miranda Waiver

The law entitles Mr. Madrigal to a pretrial hearing to determine the voluntariness of his confession before the confession is admitted into evidence and offered to the jury. *See Jackson v. Denno*, 378 U.S. 368, 376-77 (1964). The burden is on the prosecution to show compliance with Miranda's prophylactic rule. *Miranda v. Arizona*, 384 U.S. 436, 444 (1966). Miranda suppression hearings do not require any showing of prejudice. Wayne LaFave et. al., 3 CRIM. PROC. § 10.3(c) (2004).

A court must exclude an incriminating statement obtained on the basis of a waiver, unless the government establishes, by a preponderance of the evidence, that the waiver was voluntarily, knowingly, and intelligently given. *Colorado v. Connelly*, 479 U.S. 157, 168 (1986). The government's burden to make such a showing "is great," and the court will "indulge every reasonable presumption against waiver of fundamental constitutional rights." *United States v. Heldt*, 745 F.2d 1275, 1277 (9th Cir. 1984) (citing *Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); *North Carolina v. Butler*, 441 U.S. 369, 373 (1966) (courts "must presume that a defendant did not waive his rights").  To satisfy this burden, the prosecution must prove that the relinquishment of the right was "voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion, or deception" and that the defendant had a "full awareness of the nature of the right being abandoned and the consequences of the decision to abandon it."  *Moran v. Burbine*, 475 U.S. 412, 421 (1986). Only if the "totality of the circumstances surrounding the interrogation" reveals both an uncoerced choice and the requisite level of comprehension may a court properly conclude that the *Miranda* rights have been waived. *Fare v. Michael C.*, 442 U.S. 707, 725 (1979); *United States v. Broussard*, 80 F.3d 1025, 1033 (5th Cir. 1996).

**B.    Mr. Madrigal's Miranda Waiver Was Not Knowing and Intelligent**

The validity of a *Miranda* waiver has "two distinct dimensions"--whether the waiver is voluntary and whether it is knowing and intelligent. *Colorado v. Spring*, 479 U.S. 564, 573 (1987) (quoting *Moran v. Burbine*, 475 U.S. 412, 421 (1986)); *Derrick v. Peterson*, 924 F.2d 813, 820 (9th Cir. 1990) (affirming "distinct nature of the knowing and intelligent prong of the waiver inquiry"); *Miller v. Dugger*, 838 F.2d 1530, 1539 (11th Cir. 1988) (noting ongoing "distinction between voluntariness and knowing waivers"). This review mandates inquiry into an evaluation of "age, experience, education, background, and intelligence, and into whether he has the capacity to understand the warnings given him, the nature of his Fifth Amendment rights, and the consequences of waiving those rights." *Fare*, 442 U.S. at 725.

Characteristic attributes of foreign nationals bear on the reliability of Miranda waivers.  See, e.g., *United States v. Yunis*, 681 F. Supp. 909, 964-66 (D.C. Cir. 1988) ("([a]n individual's foreign background seems especially pertinent to the knowing quality of a waiver."); *United States v. Garibay*, 143 F.3d 534 (9th Cir. 1998) (factors to assess in the totality of the circumstances include: any language difficulties encountered by the foreign national during custodial interrogation; his mental capacity; whether he signed a written waiver; whether the advice of rights was in his native language; whether he appeared to understand those rights; whether he had the assistance of a translator; whether his rights were explained painstakingly; and whether he had experience with the American criminal justice system.)

Factors such as an ignorance of the American legal system bear heavily on a determination that a waiver was knowing and intelligently made. *See, e.g., United States v. Short*, 790 F.2d 464 (6th Cir. 1986) (statement inadmissible where German defendant had poor command of English, no understanding of U.S. criminal justice system, and no assistance of interpreter); *United States v. Fung*, 780 F. Supp. 115 (E.D.N.Y. 1992) (Chinese-speaking defendant was not properly advised of her rights given her poor language skills, her lack of knowledge of the American legal system and the stress of the situation); *United Status v. Nakhoul*, 596 F. Supp. 1398, 1402 (D. Mass. 1984) (in light of the changed circumstances of the second interrogation, court found that the defendant, whose "understanding of American law, customs, and constitutional rights may be limited, did not understand that the same [*Miranda*] rights could be asserted during questioning by any law officer."); *Gov't of the Canal Zone v. Gomez*, 566 F.2d

1289, 1292 (5th Cir. 1978) (foreign defendant "not familiar with American customs or the Bill of Rights" unable to "knowingly and intelligently waive his right to counsel.").

In this case, Mr. Madrigal was a recent arrival to the United States, with no appreciable understanding of the American criminal justice system, or his Constitutional rights within that system. Though he had been arrested in Oregon in 2021, there is nothing to indicate he was advised of his Constitutional rights or even met and consulted with an attorney before or after his release on bond. Moreover, after his arrest in Reedley, California, the interrogating officers did not adequately explain to Mr. Madrigal the import of his Miranda rights.

All too often, Mexican nationals are unable to understand their legal rights when facing interrogation. *See* Eugene Briere, "Limited English Speakers and the Miranda Rights", TESOL Quarterly 12: 235-245 (1978); *see also* Flo Messier, "Alien Defendants in Criminal Proceedings: Justice Shrugs," 36 American Criminal Law Review 1395 (1999) ("the meaning of Miranda warnings can be unfathomable to an accused even when read in his native language."). Here, government agents failed to properly and adequately explain the rights Mr. Madrigal possesses under *Miranda v. Arizona*, 384 U.S. 436 (1966). *Miranda* warnings must reasonably convey the rights to the suspect. See *California v. Prysock*, 453 U.S. 355, 360-61 (1981). *Miranda* requires "meaningful advice to the unlettered and unlearned in language which he can comprehend and on which he can knowingly act." *Coyote v. United States*, 380 F.2d 305, 308 (10th Cir. 1967), *cert. denied*, 389 U.S. 992 (1967). As the Illinois Supreme Court has noted, "[T]o waive rights intelligently and knowingly, one must at least understand basically what those rights encompass and minimally what their waiver will entail." *People v. Bernasco*, 562 N.E.2d 958, 964 (Ill. 1990).

The failure to provide a *Miranda* advisement in the defendant's native language is of itself grounds for potential reversal, where the defendant's grasp of the English language is clearly limited. See *United States v Tsoi Kwan Sang*, 416 F.2d. 306 (5th Cir. 1969) (remanding for further proceedings where the reviewing court expressed "grave doubt" as to Chinese defendant's ability to sufficiently understand his Miranda rights in order to waive them). Numerous courts have suppressed the statements of Hispanic defendants where the *Miranda* warning was not adequately conveyed.  See *United States v. Garibay*, 143 F.3d 534, 537 (9th Cir. 1998); *United States v. Castorena-Jaime*, 117 F.Supp.2d 1161 (D. Kan. 2000);

*United States v. Bejar*, 1995 WL 548771 (N.D.Ill.1995); *United States v. Higareda-Santa Cruz*, 826 F. Supp 355 (D. OR. 1993); *Barcenas v. State*, 33 S.W.3d 136 (Ark. 2000); *State v. Santamaria*, 464 So.2d 197 (Fla. Dist. Ct. App. 1985); *State of Ohio v. Ramirez*, 732 N.E.2d 1065 (Ohio Ct. App. 1999); *State v. Lopez*, 476 S.E.2d 227 (W. Va. 1996).

Here, the *Miranda* rights given to Mr. Madrigal were given in English, then translated by another agent into Spanish. However, no explanation of the rights – in either language – was given to Mr. Madrigal. The interrogating agent knew that Mr. Madrigal was a recent arrival to the United States and that he had no appreciable understanding of the U.S. legal system. All three of the agents who were present during the custodial interrogation knew that Mr. Madrigal was a citizen of Mexico, knew that Mr. Madrigal did not understand much English, and even so the interrogating officer did not take the time to explain the Miranda rights to Mr. Madrigal. The agent present for translation purposes expressly stated to the other agents, in English, that Mr. Madrigal "didn't really know how the system works here," referring to the criminal justice system in the United States. See, Post-Arrest Interview at 17. When Mr. Madrigal was read his Miranda rights, it was done in a cursory manner, with no explanation provided regarding the meaning or significance of those rights. Mr. Madrigal, lacking any prior exposure to these rights and their implications, was not given an opportunity to fully comprehend the protections afforded to him.

On their face, the Miranda rights read to Mr. Madrigal were correct. The rights were stated in English, however, "[m]erely giving warnings to an accused does not satisfy the duties of an interrogating officer or make any statement the accused might then make admissible. . . . The officer [needs to] go further and made sure the accused, knowing his rights, voluntarily relinquishes them." *United States v. Rodriguez*, 931 F.Supp. 907 (D. Mass. 1996). In this case, the rights were recited in English and interpreted in Spanish, but because of his limited English and his own cultural background and limited exposure to the U.S. criminal justice system, Mr. Madrigal simply did not understand his *Miranda* rights.

Where a bilingual law enforcement officer acts as an interpreter, the confession may be suspect. The court will look at which party supplied the interpreter, whether the interpreter had any motive to mislead or distort; the interpreter's qualifications and skill level and whether actions taken subsequent to the conversation were consistent with the statements as translated. *United States v. Martinez-Gaytan*, 213

F. 3d 890, 892 (5th Cir. 2000). In *Martinez-Gaytan*, the court remanded the case back for testimony from the officer who acted as the interpreter in order to determine his reliability and evaluate whether the confession was truly voluntary. In this case, the police interpretation of the *Miranda* warning was clearly deficient. For example, Agent Desmond asks in English, "Is he comfortable talking to us without a lawyer?" However, the translator rendered this questions as, "Eh, quiere hablar con nosotros, lo que le pregunten?" – translating to "Uh, do you want to talk to us, what they ask you?" and failing to convey the critical aspect of whether Mr. Madrigal was comfortable speaking without the presence of counsel, and instead only asking if he was willing to answer the agents' questions. When the interrogating officer asked "Does he understand his rights?" the interpreting officer relays "did you understand what I told you?" See, Post-Arrest Interview, at 26.

The agent serving as a translator made frequent and significant errors before, during, and after the reading of Mr. Madrigal's Miranda rights, further calling into question the reliability of any alleged waiver. His errors included omissions, mistranslations, and imprecise phrasing that failed to accurately convey the meaning of key statements. The agent serving as a translator, "AG3," repeatedly failed to accurately convey the literal meaning of statements that were supposed to be translated from Special Agent Travis Desmond, "AG2", into Spanish for Mr. Madrigal throughout the post-arrest interview. These translation errors resulted in significant discrepancies between what was said and what Mr. Madrigal actually understood.

| | |
|---|---|
| AG2 [In English]: | So, um, before we get into the questions, I just gotta ask you some basic questions, just your biography. Things like that. |
| AG3 [English Translation]: | They're gonna ask you some questions about the-like your name… |
| | |
| AG2 [In English]: | Hair color…. |
| AG3 [English Translation]: | Personal things about you, just– |
| | |
| AG2 [In English]: | Eye color… |
| AG3 [English Translation]: | …right now, okay? |

See, Post-Arrest Interview, at 5.

1    Given that law enforcement itself supplied the interpreter, the court must scrutinize whether the

2    agent's lack of neutrality, qualifications, or skill level contributed to distortions that undermined Mr.

3    Madrigal's ability to fully understand his rights and the implications of waiving them. Moreover, several

4    of Mr. Madrigal's personal attributes, including his youth at the time of his arrest, his lack of experience

5    in the American criminal justice system, his limited education, and state of physical distress due to his

6    injuries made it impossible for him to adequately comprehend this grossly deficient interpretation of his

7    legal rights.

8    Providing a foreign suspect with a confusing or incomplete printed translation of the Miranda

9    warning is grounds for suppression. *See, e.g., United States v. Garcia*, 431 F.2d 134 (9th Cir. 1970)

10   (waiver held to be invalid because the defendant was given several different versions of *Miranda*

11   warnings, none of which fully complied with *Miranda*, and, which taken together, were inconsistent;

12   *United States v. Higareda-Santa Cruz*, 826 F. Supp 355 (D.OR. 1993) (finding that even if defendant had

13   read the Spanish rights card, the card's statement of the rights was faulty and inadequate). Furthermore,

14   it is not sufficient that the accused, when read his rights in his own language off a Miranda language card,

15   understands the general gist of his rights; rather, there must be an "effective and express explanation" of

16   each right. *People v. Diaz*, 140 Cal.App.3d 813, 822-23(Cal. Ct. App. 1983).

17   Mr. Madrigal's difficulty in completing the waiver form makes it clear that he lacked proficiency

18   in reading Spanish. He was unable to write the date of the interrogation without assistance, did not know

19   how to properly sign his name, and failed to write his name in capital letters as instructed on the form.

20   These struggles strongly suggest that he did not fully understand how to complete the waiver, and further

21   calls into question whether he could have knowingly and intelligently waived his rights.

22   It is well-settled that all Miranda warnings must "reasonably convey" to a suspect "his rights as

23   required by *Miranda v. Arizona*, 384 U.S. 436 (1966)]." *Florida v. Powell*, 130 S. Ct. 1195, 1204 (2010)

24   (internal quotation marks omitted) (quoting *Duckworth v. Eagan*, 492 U.S. 195, 203 (1989); *California

25   v. Prysock*, 453 U.S. 355, 361 (1981) (per curiam)). In this case, however, it is readily apparent that the

Spanish-language warning did not meet these requirements. The interpreting officer on several instances

uses an incorrect word – referring to the interrogation as an "integration," referring to an attorney being

"appainted," and then asks if Mr. Madrigal was willing to answer questions without the "witnessing" of

an attorney – all of which contributed to a failure to accurately and adequately convey the *Miranda* requirements.  Mr. Madrigal was not entitled to have an "appointed" attorney "witness" his "integration"; he is entitled to a have an attorney (appointed, if he cannot afford one) present with him when he answers questions that might yield incriminating statements.   A warning given in Spanish that fails to reasonably convey the government's obligations under *Miranda* is constitutionally infirm, and here the Spanish warnings failed miserably.   See *United States v. Perez-Lopez*, 348 F.3d 839, 848 (9th Cir. 2003).

The constitutional infirmity is not cured if the officers also administered correct *Miranda* warnings in English to Mr. Madrigal. Even if Mr. Madrigal understood the English-language warnings, there is no indication in the record that the government clarified which set of warnings was correct. *United States v. San Juan-Cruz*, 314 F.3d 384, 388, 389 (9th Cir. 2002) ("When a warning, not consistent with Miranda, is given prior to, after, or simultaneously with a Miranda warning, the risk of confusion is substantial, such that the onus is on the Government to clarify to the arrested party the nature of his or her rights under the Fifth Amendment."). Absent such a clarification, a defendant cannot be presumed to have "sufficient legal or constitutional expertise to understand what are his . . . rights under the Constitution." *San Juan-Cruz*, 314 F.3d at 389 (citing *Miranda*, 384 U.S. at 472); *accord United States v. Botello-Rosales*, 728 F.3d 865, 868 (9th Cir. 2013).

Without a subsequent clarification, even a single mistranslated word can be sufficient to render the warning constitutionally inadequate, so that Mr. Madrigal's "subsequent statements may not be admitted as evidence against him." *Botello-Rosales*, 728 F.3d at 867 (suppressing statement where Spanish-language warning erroneously used the word "libre," which failed to convey an indigent defendant's right to an attorney without cost); *see also Perez-Lopez*, 348 F.3d at 848 ("To be required to 'solicit' the court, in the words of [the Spanish-language] warning, implies the possibility of rejection"); *accord United States v. Higareda-Santa Cruz*, 826 F.Supp. 355, 359-60 (D.Or.1993) (Spanish-language warning of right to 'petition' the court for appointment of counsel invalidated Miranda waiver). In short, "[r]egardless of circumstance, a Miranda warning must be read and conveyed to all persons clearly and in a manner that is unambiguous." *San Juan-Cruz*, 314 F.3d at 389.

The officers never asked if Mr. Madrigal understood each of his rights, after each one was read to him. A determination that the defendant was asked if he understood each of his rights is a standard

element in determining the validity of a *Miranda* waiver. See, e.g., *United States v. Garcia Abrego*, 141 F. 3d 142, 171 (5th Cir. 1998) (finding Miranda waiver valid where defendant "stated to [the police] that he understood each of these rights"); *People v. Box*, 99 Cal.Rptr.2d 69, 98 (2000) (finding valid waiver where defendant was asked and affirmatively answered "Do you understand each of these rights that I have explained to you?"); *People v. Michaels*, 122 Cal.Rptr.2d 285, 300 (2002) (same); see also *People v. Mejia-Mendoza*, 965 P.2d 777, 778 (Colo. 1998) (circumstances making Miranda waiver invalid included "the advisement was read without pause and without an opportunity for Mejia-Mendoza to indicate whether he understood each individual right.").

Mr. Madrigal was never asked if, understanding these rights, he was willing to speak with the agents. See *United States v. Porter*, 764 F.2d 1, 7 (1st Cir. 1985) ("Merely asking the accused whether he understood his rights does not satisfy the duties of an interrogating officer or make any statement the accused might then make admissible. Miranda requires the interrogating officer to go further and make sure that the accused, knowing his rights, voluntarily relinquishes them."); *see also Miranda v. Arizona*, 384 U.S. 436, 476 (1966) (emphasis added) ("The requirement of warnings and waiver of rights is a fundamental with respect to the Fifth Amendment privilege and not simply a preliminary ritual to existing methods of interrogation."). Here, the interpreting officer told Mr. Madrigal "if you don't understand what I'm saying, or the rights, tell me at the end and we can explain it to you." See, Post-Arrest Interview at 24. Mr. Madrigal had a fundamental right to have his Miranda rights explained to him in a manner he could understand, ensuring any waiver was made knowingly, intelligently, and voluntarily. Instead, the agents merely recited the rights from a page they were reading, presenting them as a routine procedural formality rather than critical legal protections.

| | |
|---|---|
| AG2 [In English]: | Something we have to do to everybody. You know? |
| AG3 [English Translation]: | It-it's what we have to do to people who are detained or arrested. |
| Mr. Madrigal [English Translation]: | Uh-huh. |
| AG2 [In English]: | Following the checklist. |
| Mr. Madrigal [English Translation]: | Oh, alright. |
| AG3 [English Translation]: | It's-it's procedure here, that we have to do. |
| | |
| AG1 [In English]: | I don't speak Spanish, so he's gonna read it to you. |
| AG3 [English Translation]: | Okay, I'm gonna read you the rights and then, uh, we go |

|   |   |
|---|---|
| | from there, okay? |
| Mr. Madrigal [English Translation]: | Mm-hmm. |
| | |
| AG1 [In English]: | If you-if you'd don't understand it, just tell-tell him you don't understand it, and we'll explain it. |
| AG3 [English Translation]: | If you don't understand what I'm saying or the rights… |
| Mr. Madrigal [English Translation]: | Mm-hmm. |
| AG3 [English Translation]: | …tell me at the end and we can explain it to you. |
| Mr. Madrigal [English Translation]: | Explain, uh-huh. |
| AG3 [English Translation]: | Okay? Okay, so it says, before asking you any questions, it is my duty to inform you about your rights… |

See, Post-Arrest Interview, at 24.

Rather than making any effort to confirm Mr. Madrigal's comprehension, the agents characterized the warning as a procedural step they were required to complete, failing to convey that these rights were his to invoke or waive. This approach reduced Miranda to a bureaucratic checkbox rather than a meaningful safeguard, depriving Mr. Madrigal of the informed choice to exercise or relinquish his rights.

After Mr. Madrigal initially signed the Miranda waiver form, he was eventually allowed to use the restroom as he had been requesting. Upon returning to the interrogation room, the agents informed Mr. Madrigal they had to read his rights to him again.

|   |   |
|---|---|
| AG3 [English Translation]: | You did understand what- what I told you about the paper you signed? |
| Mr. Madrigal [English Translation]: | Uh-huh. |
| AG1 [In English]: | So, every time we leave the room, we have to do it again. |
| AG3 [English Translation]: | Each time we leave the room we have to return. I have to read them to you again, okay? |
| Mr. Madrigal [English Translation]: | Oh, okay. |
| AG1 [In English]: | Don't ask me why, um– |
| AG3 [English Translation]: | He doesn't know why, but it's part of the procedure |

See, Post-Arrest Interview, at 35.

Telling Mr. Madrigal, "Don't ask me why," was a clear violation of Mr. Madrigal's constitutional protections. Law enforcement has a legal duty not only to recite Miranda warnings, but to ensure that a defendant fully understands the gravity of the rights being waived. By discouraging Mr. Madrigal from questioning the purpose of the warning, the agents failed in their obligation to confirm his full

comprehension of his waiver, fully demonstrating that any alleged waiver could not have been made knowingly, intelligently, or voluntarily.

Lengthy residence in the United States or past encounters with its criminal justice process are no guarantee that a non-citizen is sufficiently acculturated to understand and invoke his rights effectively. Studies have shown no significant difference between non-offenders and those with prior criminal records in the comprehension of *Miranda* rights. *See, e.g.,* Thomas Grisso, *Juvenile's Capacities to Waive Miranda Rights: An Empirical Analysis*, 68 CAL L. REV. 1134, 1156, 1166 (1980). It should therefore not be presumed that a vulnerable and marginalized foreigner like Mr. Madrigal fully comprehended his legal rights this time simply because he might have been advised of those rights previously. See *United States v. Rangel-Gonzalez*, 617 F.2d 529, 533 n. 5 (9th Cir. 1980) (unilingual Spanish-speaking appellant was advised at least five prior times of right to counsel but only twice in Spanish, by "nothing more than a sentence buried in a standard printed form…There is no indication that the right to counsel was explained to him or that he was given any idea how he might contact an attorney."). Well before any Miranda rights were read, agents asked Mr. Madrigal if he had been previously arrested, and Mr. Madrigal stated that he had been arrested in Oregon.

| | |
|---|---|
| AG1 [In English]: | So, when you were arrested, do you remember before the– the officer was talking to you, he read you your rights? |
| AG3 [English Translation]: | So, before you got arrested, did they give you your-your rights, uh, the officers? Don't you remember? |
| Mr. Madrigal [English Translation]: | No, they didn't give them to me. |
| | |
| AG1 [In English]: | So, in-in-in America – |
| Mr. Madrigal [English Translation]: | Just now? |
| | |
| AG1 [In English]: | No, in O–in Oregon. |
| AG3 [English Translation]: | In Oregon, when you got arrested in Oregon. Did they give you your rights that you had– |
| Mr. Madrigal [English Translation]: | Oh– |
| AG3 [English Translation]: | …when they were going to ask you questions about the–? |
| Mr. Madrigal [English Translation]: | Oh, y- I think so, but the- the police officer who arrested us didn't show up to the hearings because he did some illegal things like, uh, he didn't he stopped- I think he stopped the guy without a reason and I think he got in the car without- |

|  |  |
|---|---|
|  | without permission. And the guy was- was there- because I'd talk to him- |
| AG3 [English Translation]: | But you don't- don't remember they gave you your- your rights to you? |
| Mr. Madrigal [English Translation]: | No. I don't think so. |
| AG3 [English Translation]: | He doesn't remember. |

See, Post-Arrest Interview, at 21.

Despite Mr. Madrigal's brief interaction with law enforcement in the past after his arrest in 2021, his responses during his post-arrest interview in 2023 demonstrate a fundamental lack of understanding of the legal system and his rights within it. His confusion over whether he had ever been read his rights underscores his unfamiliarity with Miranda warnings and their significance. Rather than directly assessing whether Mr. Madrigal fully comprehended the rights he was waiving, the agents relied on overly vague questioning, failing to actually clarify whether he understood the legal protections at stake. This exchange highlights that Mr. Madrigal's waiver, if any, was not made knowingly, intelligently, or voluntarily.

In this case, Mr. Madrigal responded affirmatively to the police question of whether he understood his rights. However, Mr. Madrigal's response was not an indication he understood his rights. *See, e.g., United States v. Porter*, 764 F.2d 1, 7 (1st Cir. 1985) ("Merely asking the accused whether he understood his rights does not satisfy the duties of an interrogating officer or make any statement the accused might then make admissible. *Miranda* requires the interrogating officer to go further and make sure that the accused, knowing his rights, voluntarily relinquishes them"). In this case, there is ample evidence that Mr. Madrigal did not understand his Fifth and Sixth Amendment rights, despite his own assertion to the contrary. For example, the agent did not specifically inquire whether Mr. Madrigal understood each individual right, nor did the agent inquire as to whether Mr. Madrigal was waiving each individual right.

### C.     Mr. Madrigal's Waiver Was Not Voluntary

Miranda protects aliens, lawfully present or otherwise, against the inherent pressures of custodial interrogation. See *United States v. Moya*, 74 F.3d 1117, 1119 (11th Cir. 1996); *Barrera-Echavarria v. Rison*, 44 F.3d1441, 1449 (9th Cir. 1995); *United States v. Henry*, 604 F.2d 908, 914 (5th Cir. 1979). The particular facts and circumstances, including the background, experience and conduct of the accused determine the validity of the waiver. *North Carolina v. Butler*, 441 U.S. 369, 373 (1979)(*citing Johnson v. Zerbst*, 304 U.S. 458, 464 (1938)); *United States v. Bernard S.*, 795 F.2d 749, 751 (9th Cir. 1986).

Voluntariness turns on all the surrounding circumstances, "both the characteristics of the accused and the details of the interrogation," *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973); it does not depend on whether the confession is trustworthy. *Rogers v. Richmond*, 365 U.S. 534, 543-544 (1961). Although a determination that a confession was involuntary requires a finding of coercive police conduct, *Colorado v. Connelly*, 479 U.S. 157 (1986), a coerced statement is one that was "'extracted by any sort of threats or violence, [or] obtained by any direct or implied promises, however slight, [or] by the exertion of any improper influence.'" *Hutto v. Ross*, 429 U.S. 28, 30 (1976) (quoting *Bram v. United States*, 168 U. S. 532, 542-543 (1897). Mr. Madrigal's waiver of Miranda rights was not voluntarily made.

The circumstances surrounding Mr. Madrigal's interrogation further demonstrates that any alleged waiver of his Miranda rights was not voluntary. During the interview, Mr. Madrigal repeatedly expressed physical discomfort – he was cold due to his lack of clothing (and at the time of the interrogation was wrapped in a blanket), he was covered in painful cuts sustained when he was tackled by agents, and he had reported significant pain in his temple after hitting his head on the ground. Despite these conditions, the agents proceeded with questioning rather than addressing his immediate physical needs. Mr. Madrigal also requested to use the restroom twice, yet the agents proceeded with obtaining his name on their form, directing him where to write his full name and where to enter the date.

Mr. Madrigal's repeated requests to use the restroom further demonstrate that his waiver was not voluntarily given. He first asked to use the restroom before signing the waiver, yet the agents proceeded with obtaining his signature on the waiver form rather than granting his request. Immediately after signing, he again asked to go, strongly suggesting that his primary motivation for signing was to gain access to basic needs rather than a genuine understanding and waiver of his rights. Courts have

consistently recognized that allowing a detained person in custody to use the restroom weighs in favor of voluntariness in giving a statement.  See, e.g., *United States v. Jones*, 359 F.3d 921, 924 (7th Cir. 2004) ("Jones was not handcuffed, and, although he never asked, was not denied beverages, phone calls, or access to a restroom… [T]he totality of the circumstances show that Jones's statements were voluntary.) Here, the agents' decision to withhold that opportunity until after securing a waiver underscores the coercive nature of the interaction and further support the conclusion that Mr. Madrigal's waiver was not made knowingly, intelligently or voluntarily.

| | |
|---|---|
| AG1 [In English]: | So he just has to…print his name… |
| Mr. Madrigal [English Translation]: | And don't you guys have like a bathroom over there? |
| AG1 [In English]: | Uh, no, but I can take him outside, um- |
| AG3 [English Translation]: | Are you in need of bathroom? |
| Mr. Madrigal [English Translation]: | Uh….yeah, honestly, I am. |
| AG1 [English Translation]: | Nu- number 1 or number 2? |
| Mr. Madrigal [English Translation]: | One |
| AG1 [In English]: | Alright. Uh, I'll see if they can get the bathroom ready right now. |
| Mr. Madrigal [English Translation]: | Yeah, alright. |
| AG3 [English Translation]: | Uh, this is your full name. Write the top line. |
| Mr. Madrigal [English Translation]: | Uh-huh…. |
| AG3 [English Translation]: | And then your signature and then, here, the day today, which is April 4. |

See, Post-Arrest Interview at 27.

Even writing the date proved challenging for Mr. Madrigal, as he required additional guidance for each digit. After signing where instructed and writing the numbers as directed to indicate the date, Mr. Madrigal again requested to use the restroom.

Mr. Madrigal's physical distress, discomfort, and the agents' disregard for his condition created a coercive environment that undermined the voluntariness of any purported waiver of his rights. Notably, immediately after obtaining Mr. Madrigal's signature on the waiver, the interrogating agents asked if Mr. Madrigal was in pain and if he was cold – both of which Mr. Madrigal affirmed, further highlighting his compromised state at the time of the alleged waiver.

In assessing whether Mr. Madrigal's waiver was voluntary, the circumstances surrounding his arrest must be considered. He had recently been tackled by law enforcement, resulting in cuts across his body and a painful head injury from hitting the ground. Now, while being questioned by different agents, but from the same agency, he was told, "Well, the reason you're detained right now is that you ran." [Page 18 of Post-Arrest Interview] This framing of events, combined with Mr. Madrigal's physical distress, created an implicit pressure to cooperate. Fearing that any perceived lack of compliance could lead to further harm or mistreatment, Mr. Madrigal was placed in a coercive environment that undermined the voluntariness of any alleged waiver.

## II.    REGARDLESS OF THE NATURE OF THE MIRANDA WAIVER, MR. MADRIGAL'S STATEMENT WAS INVOLUNTARY AND THE COURT MUST SUPPRESS THE STATEMENT.

In addition to the *Miranda* requirements of a knowing, intelligent and voluntary waiver, a statement by a defendant must satisfy the Fifth Amendment test of voluntariness. See, e.g., *Mincey v. Arizona*, 437 U.S. 385, 396-402 (1978); *People v. Raffaelli*, 647 P.2d 230, 235 (Colo. 1982) ("[t]he fact that *Miranda* warnings precede a challenged confession does not insulate that confession from an inquiry into whether it was voluntarily given"). Even after a suspect in custody has waived his *Miranda* rights, the circumstances surrounding his subsequent interrogation can rise to the level of coercion such that his ultimate confession is rendered involuntary. See *United States v. Ostrander*, 411 F.3d 684, 696 (6th Cir. 2005) ("Miranda waivers are not themselves conclusive indicators of voluntariness"); *Perry v. Kemma*, 356 F.3d 880, 886 (8th Cir. 2004) (finding Miranda waiver valid and then proceeding to analyze whether subsequent police conduct rendered confession involuntary). Factors relevant to the determination of voluntariness include: "(1) the age, intelligence, and education of the defendant; (2) the length of detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of his constitutional rights; and (5) whether the defendant was subjected to physical punishment." *United States v. Toles*, 297 F.3d 959, 966 (10th Cir. 2002) (internal citations omitted).

A statement is involuntary if it is "extracted by any sort of threats or violence or obtained by direct or implied promises, however slight or by the exertion of any improper influence." *Bram v. United States*, 168 U.S. 532, 542-43 (1897). The Supreme Court has stressed that it will not tolerate the admission of an involuntary confession into evidence at a criminal trial.  See *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960).  "[C]ertain interrogation techniques, either in isolation *or as applied to the unique characteristics of a particular suspect* are so offensive to a civilized system of justice that they must be condemned under the Due Process Clause."  *Miller v. Fenton*, 474 U.S. 104, 109 (1985)(emphasis added); accord *Self v. Collins*, 973 F.2d 1198, 1205 (5th Cir. 1992).  If a confession is not the "product of a rational intellect and a free will," then its admission into evidence violates due process.  *Blackburn*, 361 U.S. at 208.  Such a statement may not be used as evidence in the Government's case-in chief or for impeachment purposes, because "[any] criminal trial use against a defendant of his involuntary statement is a denial of due process of law." *Mincey*, 437 U.S. at 398 (1978).

Due process takes into consideration "the totality of the surrounding circumstances -- both the characteristics of the accused and the details of the interrogation," *Schneckloth v. Bustamonte*, 412 U.S. 218, 223 (1973), and is determined by "a weighing of the circumstances of pressure against the power of resistance of the person confessing." *Stein v. New York*, 346 U.S. 156 (1953); see also *State v. Xiong*, 504 N.W.2d 428 (Wis. Ct. App. 1993) (police coercion and a defendant's personal characteristics are interdependent concepts: the more vulnerable a person is because of his unique characteristics, the more easily he may be coerced by subtle means). It is not sufficient for a court to consider the circumstances in isolation. Instead, "all the circumstances attendant upon the confession must be taken into account." *Reck v. Pate*, 367 U.S. 433, 440 (1961).

 "'The relinquishment of the right must have been voluntary in the sense that it was the product of a free and deliberate choice rather than intimidation, coercion or deception.'" *United States v. Mendoza-Cecelia*, 963 F.2d 1467, 1475 (11th Cir. 1992) (citation omitted). The Supreme Court has long recognized that foreign nationals are especially susceptible to making involuntary statements. See *Miranda*, 384 U.S. at 457 (potentiality for compulsion is "forcefully apparent" in a case where the suspect was an "indigent Mexican defendant"). Other courts have likewise found that foreign nationality is a relevant factor in the voluntariness analysis. See *United States v. Shi*, 525 F.3d 709, 730 (9th Cir. 2008) (when the challenged

statement was given by a foreign national, the Court will "[o]f course . . . consider whether extra steps were taken to ensure that the defendant understood his rights" (citing *United States v. Amano*, 229 F.3d 801, 804–805 (9th Cir. 2000)); see also *United States v. Moreno*, 742 F.2d 532, 536 (9th Cir. 1984) (defendant's "lack of familiarity with police procedures in this country, his alienage and his limited ability to speak and understand the English language contributed significantly to the quantum of coercion present".).

Neither physical intimidation nor psychological pressure is permissible. *United States v. Tingle*, 658 F.2d 1332, 1335 (9th Cir. 1981) (subtle psychological coercion suffices at times more effectively "to overbear a rational intellect and a free will") (quoting *Blackburn*, 361 U.S. at 208); see also *Blackburn*, 361 U.S. at 206 ("prolonged interrogation of an accused who is ignorant of his rights and who has been cut off from the moral support of friends and relatives is not infrequently an effective technique of terror."); *Sims v. Georgia*, 389 U.S. 404 (1967); *Jurek v. Estelle*, 623 F.2d 929 (5th Cir. 1980); *State v. Zoerner*, 418 So. 2d 604 (La. 1982) (considering separation from family along with other factors).

A confession given where government agents exploited the defendant's mental condition using "subtle forms of psychological persuasion" is often involuntary. *Colorado v. Connelly*, 479 U.S. 157, 164 (1986); accord *United States v. Raymer*, 876 F.2d 383, 386-87 (5th Cir. 1989); see also *Brady v. United States*, 397 U.S. 742, 754, (1970) ("even a mild promise of leniency" will render a statement involuntary); *Henry v. Dees*, 658 F.2d 406, 410 (5th Cir. 1981) ("Misrepresentations can [render a confession involuntary], by distorting the alternatives among which the person under interrogation is being asked to choose").

Furthermore, limited mental ability and unfamiliarity with the criminal process are factors that weigh heavily against the voluntariness of a confession. *Cooper v. Griffin*, 455 F.2d 1142, 1145 (5th Cir. 1972); *Gladden v. Unsworth*, 396 F.2d 373, 380-81 (9th Cir. 1968) (mental illness a relevant factor in the voluntariness analysis). In reviewing the totality of the circumstances, "the objective evaluation of police conduct must take into consideration defendant's mental condition. In other words, the propriety of the investigative and interrogation techniques used must be judged in light of what the police knew or should have known about defendant's ability to comprehend the events and circumstances surrounding him or her." *State v. Carrillo*, 750 P.2d 883, 895 (Ariz. 1988) (emphasis added). The United States

Supreme Court has repeatedly recognized that a confession by a person of limited intelligence is more likely to be involuntary. See, e.g., *Sims v. Georgia*, 389 U.S. 404, 407 (1967); *Fikes v. Alabama*, 352 U.S. 191, 196 (1957).

Mr. Madrigal's cognitive limitations further weigh against the voluntariness of his alleged waiver. Around the age of 5, Mr. Madrigal sustained a traumatic brain injury after falling down a flight of stairs, which left him in a comatose state for several months. Mr. Madrigal had to relearn how to use his arms and hands, and the lasting effects of this injury include daily headaches of varying duration and severity, episodes of dizziness upon standing, and difficulty maintaining attention. Mr. Madrigal's history of traumatic brain injury, coupled with his head injury sustained during his arrest, raise serious doubts as to whether he could have voluntarily, knowingly, and intelligently waived his Miranda rights.

As previously noted, Mr. Madrigal has a limited education, a factor that is profoundly relevant to the determination of voluntariness. See *Clewis v. Texas*, 386 U.S. 707, 712 (1967) (fact that defendant has only a fifth grade education considered in finding statement involuntary); *Payne v. Arkansas*, 356 U.S. 560, 567 (1958); *Reck v. Pate*, 367 U.S. 433, 441 (1961); *State v. Zoerner*, 418 So. 2d 604 (La. 1982) (seventh-grade education a factor in holding statement involuntary). Mr. Madrigal's limited education, a consequence of having to flee his home country, further impaired his ability to fully comprehend the significance of the rights he was being asked to waive. His limited formal schooling and unfamiliarity with the American legal system makes him particularly vulnerable to coercion and misunderstanding during the interrogation.

## III.    THE COURT MUST ALSO CONSIDER THE VIOLATION OF CONSULAR RIGHTS IN THIS CASE, AS PART OF THE TOTALITY OF THE CIRCUMSTANCES WARRANTING SUPPRESSION

### A.    The Treaty Violation in This Case is Highly Relevant to the Voluntariness Inquiry

In light of *Sanchez-Llamas v. Oregon*, 548 U.S. 331 (2006), Mr. Madrigal asserts that the violation of consular treaty obligations following his arrest is relevant to determining the admissibility of his

statements. The Vienna Convention on Consular Relations ("VCCR") is a multilateral treaty regulating consular rights, functions and obligations for some 179 nations, including Mexico and the United States. Vienna Convention on Consular Relations, April 24, 1963, 21 U.S.T. 77. The United States unconditionally ratified the treaty in 1969; as a result, it became binding on all local and state authorities under the Supremacy Clause of the United States Constitution. U.S. CONST. Art. VI, cl. 2; *Hines v. Davidowitz*, 312 U.S. 52, 62-63 (1941) (a treaty establishing rules governing the rights or privileges of aliens "is the supreme law of the land").

Article 36(1)(b) of the VCCR requires that the detaining authorities must advise a foreign national *without delay* of his right to consular notification:

> …if he so requests, the competent authorities of the receiving State shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that State is arrested or committed to prison or to custody pending trial or is detained in any other manner.  Any communication addressed to the consular post by the person arrested in prison, custody or detention shall also be forwarded by the said authorities without delay.  The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph.

Article 36(1)(c) grants consular officers the right "to visit a national of the sending State who is in prison, custody or detention, to converse and correspond with him and to arrange for his legal representation." Finally, Article 36(2) provides that local laws and regulations "must enable full effect to be given to the purposes for which the rights accorded under this article are intended."

In *Sanchez-Llamas*, the U.S. Supreme Court held that suppression was not a *per se* remedy for an Article 36 violation. *Sanchez-Llamas*, 548 U.S. at 350. However, the Court also found that an Article 36 violation is relevant to determining the admissibility of a defendant's statements, and that other more limited pre-trial remedies could be available for the violation standing alone:

> Finally, suppression is not the only means of vindicating Vienna Convention rights. A defendant can raise an Article 36 claim as part of a broader challenge to the voluntariness of his statements to police. If he raises an Article 36 violation at trial, a court can make appropriate accommodations to ensure that the defendant secures, to the extent possible, the benefits of consular assistance.

*Id*. The Supreme Court's clear recognition of pre-trial remedies is highly pertinent to Mr. Madrigal's motion to suppress. First, under *Sanchez-Llamas*, a violation of Article 36 obligations is now part of the "totality of the circumstances" inquiry in assessing the voluntariness of custodial statements and, by

logical extension, in determining whether a *Miranda* waiver leading to those statements was knowing, intelligent and voluntary. See *Schneckloth*, 412 U.S. at 226 (totality of the circumstances for involuntariness includes whether the accused was advised of his constitutional rights); *Davis*, 384 U.S. at 741 (fact that defendant "was never *effectively* advised of his rights" was a contributing factor in the involuntariness determination) (emphasis added); see also *United States v. Amano*, 229 F.3d 801, 805 (9th Cir. 2000) (incorporating violation of consular treaty obligations into the totality of the circumstances analysis when assessing the voluntariness of *Miranda* waiver in a foreign national's case).

Second, in some circumstances, the Article 36 obligation to inform the detainee of his consular rights "without delay" must attach prior to or during the interrogation; if the advisement could always be delayed until after a statement was obtained, there would never be a viable "Article 36 claim" to introduce "as part of a broader challenge to the voluntariness" of those statements. Mr. Madrigal demonstrates *infra* that he was not informed of Article 36 rights "without delay," despite obvious and early indications of his Mexican nationality.

Courts nationwide have now recognized and applied the same broad requirement in a variety of relevant contexts. Some courts have expressly recognized that the broader challenge to involuntariness contemplated by *Sanchez-Llamas* includes challenges to the voluntaries or sufficiency of the defendant's *Miranda* waiver. See, e.g., *Cervantes-Guervara v. State*, 532 SW 3d 827, 835 (Tex. App. 2017) (in case addressing sufficiency of Miranda waiver, considering the officers' failure to advise appellant of his right to contact his consulate "as a factor in assessing the voluntariness of appellant's statement in the totality of the circumstances"); *State v. Morales-Mulato*, 744 N.W.2d 679, 686 (Minn. Ct. App. 2008) (for purposes of *Miranda* waiver analysis, holding that the violation of a foreign detainee's rights under article 36 of the Vienna Convention, "may be considered in assessing whether a statement was voluntary, knowing, and intelligent.").

Other courts have applied the *Sanchez-Llamas* requirement when assessing the voluntariness of the defendant's subsequent statement. *State v. Banda*, 639 S.E.2d 36, n.11 (S.C. 2006) (interpreting *Sanchez-Llamas* as indicating that a defendant "may successfully move for a *Jackson v. Denno* hearing to suppress a statement by asserting a violation of the consular notification provisions of a treaty, along with other factors indicating the involuntariness of a statement"); *State v. Ramos*, 297 P.3d 1251, 1254

(Okla. Crim. App. 2013) (remanding case on finding that "under *Sanchez-Llamas* an Article 36 violation can be raised as part of a broader challenge to the voluntariness of any statement made to the police and addressed in a *Jackson v. Denno* hearing"); *Anaya-Plasencia v. the State*, 642 S.E.2d 401, 404 (Ga. Ct. App. 2007) (defendant's opportunity to cross-examine interrogating detective regarding failure to provide Article 36 advisement falls under "broader challenge" requirements of *Sanchez-Llamas*); *State v. Cabrera*, 903 A.2d 427, 431 (N.J. Super. Ct. App. Div. 2006) (observing that *Sanchez-Llamas* "made clear" that a defendant can raise an Article 36 claim as part of a broader challenge to voluntariness). Under *Sanchez-Llamas*, therefore, this Court must consider the Article 36 violation as a factor relevant to both categories of involuntariness analysis.

### B.      Law Enforcement Did Not Advise Mr. Madrigal of his Rights Under Article 36

#### 1.      The police knew that Mr. Madrigal was a Mexican national.

It should have been immediately apparent to the police in this case that Mr. Madrigal was a foreign national given the fact that he did not speak English, his name was of Latin origin, he explicitly stated that he was not a United States citizen and that he did not have a Social Security number, and when asked if he was from the state of Michoacan (in Mexico) he responded that he was from the states of Jalisco and Colima (in Mexico). These clear indicators should have prompted the agents to take appropriate measure to ensure Mr. Madrigal was advised of his consulate rights. Yet, law enforcement inexplicably failed to advise Mr. Madrigal of his right to seek consular assistance at any time, let alone in the timely manner required by the VCCR.

#### 2.      Law enforcement did not advise Mr. Madrigal of the right to consular notification "without delay"

The obligation to inform a foreign national "without delay" of the right to consular notification and communication attaches whenever a foreigner is "arrested or committed to prison or to custody pending trial or is detained in any other manner." VCCR, art. 36(1)(b). It is undisputed that Mr. Madrigal was in the custody of law enforcement officers at the time of his custodial interrogation. Given the

additional fact that he is a Mexican citizen, advisement of Article 36 rights was clearly required in these circumstances.

Advisement "without delay" must take place expeditiously, as soon as the arresting authorities determine or suspect the foreign nationality of a person in detention. First, as noted *supra*, the clear implication of *Sanchez-Llamas* is that the obligation to inform the detainee of his consular rights must in some circumstances attach prior to or during his interrogation. Those circumstances would necessarily require police knowledge of probable foreign nationality coupled with the holding of the individual in any form of custody. Second, domestic authority supports a functional interpretation of "without delay". The State Department has instructed law enforcement agencies nationwide that:

> There should be no deliberate delay, and notification must occur as soon as reasonably possible under the circumstances. . . . If the identity and foreign nationality of a person are confirmed during a custodial interrogation that precedes booking, consular information should be provided at that time.

U.S. Department of State, CONSULAR NOTIFICATION AND ACCESS 21 (5th ed. September 2018).

Where, as here, the police were able to administer a timely *Miranda* warning and were aware of the detained suspect's likely foreign nationality, prompt advisement under Article 36 was "reasonably possible" and hence necessary. Indeed, "the fact that authorities were able to administer *Miranda* warnings to him during the relevant time-frame amply demonstrates that the officers had sufficient means and opportunity to provide him with [Article 36] notification." *United States v. Miranda*, 65 F.Supp.2d 1002, 1005 (D. Minn. 1999) *cf. Mallory v. United States*, 354 U.S. 449, 455 (1957) (where probable cause existed for an arrest, a six-hour delay in arraignment breached the "without unnecessary delay" requirement of Federal Rules of Criminal Procedure Rule 5 (a)).

Furthermore, the State may not argue in response that the Defendant's foreign nationality was not definitively determined by the time of the interrogation; in those circumstances, the State Department has instructed police that a ***probability*** of foreign citizenship is sufficient to trigger a consular advisement: "If it appears that the person is probably a foreign national, you should provide consular information and

treat the person like a foreign national until and unless you confirm that he or she is instead a U.S. citizen". CONSULAR NOTIFICATION AND ACCESS 21. Moreover, the views of the State Department on the interpretation of the VCCR are entitled to great weight. See, e.g., *Sanchez-Llamas*, 548 U.S. at 355 (reaffirming that "[w]hile courts interpret treaties for themselves, the meaning given them by the departments of government particularly charged with their negotiation and enforcement is given great weight" (quoting *Kolovrat v. Oregon*, 366 U.S. 187, 194 (1961)).

Furthermore, particularly when its construction does not conflict with domestic procedural rules, the interpretation of Article 36 provided by the International Court of Justice ("ICJ") is entitled to the "'respectful consideration' due an interpretation of an international agreement by an international court." *Sanchez-Llamas*, 548 U.S. at 353; see also *Breard v. Greene*, 523 U.S. 371, 375 (1998); accord *Commonwealth v. Gautreaux*, 458 Mass. 741 (Mass. 2011). According to the ICJ, although the Article 36 obligation to inform the detainee without delay is not to be understood as necessarily meaning "immediately upon arrest", there is nonetheless a duty upon the arresting authorities to give that information to an arrested person as soon as it is realized that the person is a foreign national, or once there are grounds to think that the person is probably a foreign national. *Avena and Other Mexican Nationals (Mex. v. U.S.)*, 2004 ICJ 128, ¶ 88 (emphasis added); see also Id. at ¶ 89 (finding an Article 36 violation despite advisement of consular rights 40 hours after arrest, where there were indicia of the arrestee's Mexican nationality "from the time of his initial interrogation").

### 3.     Had Police Complied With Article 36, Mr. Madrigal Would Have Invoked Consular Notification and Terminated Further Questioning Pending His Consultation With the Mexican Consulate

There was no reason why Mr. Madrigal would have hesitated to seek the assistance of the Mexican consulate; quite the reverse, in fact. Mr. Madrigal had no criminal record in Mexico to conceal, and was not wanted there by the authorities on any charges.

Consular Notification and Access, the State Department's comprehensive police training manual on Article 36 requirements, has been distributed to virtually every police department nationwide, is

readily available on-line, and includes detailed instructions on the nature of consular assistance and the procedures to be followed when detaining foreigners.  Its recommended advisement of Article 36 rights reads:

> As a non-U.S. citizen who is being arrested or detained, you may request that we notify your country's consular officers here in the United States of your situation.  You may also communicate with your consular officers.  A consular officer may be able to help you obtain legal representation, and may contact your family and visit you in detention, among other things.  If you want us to notify your consular officers, you can request this notification now, or at any time in the future.  Do you want us to notify your consular officers at this time?

U.S. Dept. of State, CONSULAR NOTIFICATION AND ACCESS (5th ed. Sept. 2018) at 73, Suggested Statements to Foreign Nationals.

Providing this information to Mr. Madrigal — a young, confused, vulnerable, and fearful foreigner — would have triggered an invocation of consular notification and a decision to await the consulate's assistance before making any other statements. The State Department manual also provides an expanded discussion of the consular function that the police likely would have relied on in answering any questions from Mr. Madrigal regarding the purpose of consular notification, such as the fact that a consular officer "may ask to speak with the detained foreign national over the phone . . . to discuss his or her situation and needs . . . and seek to ensure that the foreign national receives a fair trial". *Id.* at 30. Upon receiving a full explanation of its immediate benefits, it is even more certain that Mr. Madrigal would have seized the opportunity to invoke consular notification and then await the assistance of the Mexican Consulate.

As a recent arrival in the USA, with no prior criminal history, Mr. Madrigal was wholly unfamiliar with the U.S. criminal justice system. He failed to understand the *Miranda* warning provided to him, evincing clear signs of hesitancy and confusion. These facts provide compelling support for Mr. Madrigal's assertion that, had he been notified of his right to consular assistance, he would not have given any statement before first consulting with representatives from the Mexican Consulate.

**C.    Under These Circumstances, the Failure to Notify the Mexican Consulate "Without Delay" Also Contributed to the Involuntariness of Mr. Madrigal's Statements**

The simple and legal necessity of advising Mr. Madrigal of Article 36 rights would have triggered his decision to invoke his Fifth and Sixth Amendment rights while awaiting contact with the Mexican Consulate. However, under the circumstances of this case, the authority's disregard of the VCCR requirement that the Consulate be notified without delay creates an additional treaty violation relevant to the voluntariness inquiry under *Sanchez-Llamas*.

There is no obligation under Article 36 that police suspend an interrogation while awaiting a consular response to notification. *Sanchez-Llamas*, at 349. Nonetheless, there is a clear duty on the part of authorities to notify the consulate "without delay" if the detainee "so requests." VCCR, art. 36 (1) (b). As with advising the detainee of Article 36 rights, the State Department has instructed U.S. law enforcement agencies that "there should be no deliberate delay" in notification of the consulate, which "should occur as soon as reasonably possible under the circumstances." U. S. Dept. of State, CONSULAR NOTIFICATION AND ACCESS 25, n. 8. For this reason, the Consulate General of Mexico provides immediate and accessible assistance to detained Mexican nationals through multiple channels. All law enforcement agencies have been provided with the Consulate's contact information, including a fax line that remains operational 24 hours a day, for the purpose of ensuring arresting authorities can notify the Consulate of any detentions at any time. During regular hours, Consulate staff are available to receive notifications by way of phone or email. Outside of regular office hours, the Consulate General of Mexico in San Diego maintains an emergency number linked to a cell phone, which is carried at all times by the Consul for Protection and Legal Affairs, or another member of the protection team, including weekends and holidays.

There was sufficient time for the officers to have advised him of his Article 36 rights, to have notified the Mexican Consulate at his request by telephone or fax, and for a consular protection officer to have spoken with Mr. Madrigal prior to interrogating him.  In the circumstances of this case, it is clear that the police breached this further treaty obligation and that the violation was relevant to the voluntariness of Mr. Madrigal's statements.

It is beyond question that consular notification within the required time frame and a prompt consular response were feasible here.  Despite every reason and ample opportunity to comply with their binding treaty obligations, the competent authorities failed to inform Mr. Madrigal of his consular rights and thus never notified the Mexican Consulate of his detention. The Consulate maintains meticulous records of all notifications received from arresting authorities regarding detained Mexican nationals. A thorough search of these records confirm that no law enforcement official ever contacted the Consulate of Mexico in Fresno, the jurisdiction where Mr. Madrigal was initially detained, regarding his arrest, detention, or interrogation. Mr. Madrigal was detained on April 4, 2023; however, the Consulate was not informed of his arrest until March 11, 2024–342 days later. See Exhibit A, Affidavit of the Mexican Consulate (affirming that the Consulate did not receive timely notification of the arrest in this case).

Courts nationwide have recognized the benefits of timely notification of Mexican consulates. See, e.g., *State v. Ramirez*, 732 N.E.2d 1065, 1070-71 (Ohio App. 3d. 1999) (compliance with Article 36 obligations would have ensured that *Miranda* violation "would have been avoided" because "the American legal system would have been explained to appellant who, as a Mexican national, had not been exposed to nuances of our justice system the way that most Americans are"); *Ledezma v. State*, 626 NW.2d 134, 152 (Iowa 2001) (a Mexican consular officer "would explain the significant differences between the American and Mexican criminal justice systems"; timely contact with consular officials "can eliminate false understandings and prevent actions which may result in prejudice to the defendant"); *United States v. Miranda*, 65 F.Supp.2d 1002, 1007 (D. Minn. 1999) (denial of consular advisement to Mexican detainee would be prejudicial where "such contact might have prevented him from making the statements that he now seeks to exclude"); *United States v. Rangel-Gonzales*, 617 F.2d 529, 532-33 (9th Cir. 1980) (even if Mexican Consulate "would have done nothing more than advise appellant of his right to counsel . . . it remains difficult from a practical standpoint to equate being advised by the [arresting authority] in an adversary setting with being advised by the Mexican Consulate."); see also *Osagiede v. United States*, 543 F.3d 399, 403 (7th Cir. 2008) (prompt consular assistance "can be invaluable because cultural misunderstandings can lead a detainee to make serious legal mistakes, particularly where a detainee's cultural background informs the way he interacts with law enforcement officials and judges").

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Had the Consulate been timely notified of Mr. Madrigal's detention by law enforcement, or had he been properly advised of his right to consular notification and contacted the Consulate himself, immediate protective measures would have been implemented. The Consulate's established protocol ensures that the Protection Department promptly intervenes in cases involving Mexican nationals facing serious criminal charges and ensures legal and humanitarian assistance without delay. The failure to notify the Consulate in this case represents a significant violation of Mr. Madrigal's rights under the CCR, warranting appropriate remedial action by this Court.

Mexico's consular officers are trained to provide comprehensive and immediate assistance to Mexican nationals facing serious charges. Their consistent practice upon learning of the detention of Mexican nationals is to contact them as soon as possible in order to ensure that they understand their legal rights. See Exhibit A, Affidavit of the Mexican Consulate. Cf. U.S. Dept. of State, FOREIGN AFFAIRS MANUAL, (2004), § 7 FAM 422 at (f) (emphasis added) (U.S. consular officers "must make every effort to gain prompt personal access to an arrested U.S. citizen or national" in order to have "the opportunity to explain the legal and judicial procedures of the host government and the detainee's rights under that government at a time when such information is most useful"). Consistent with such practices, the consular officers would have advised Mr. Madrigal that his conversations were potentially monitored by law enforcement and that any statements he made could be recorded and used against him in court. Furthermore, the Consulate would have recommended that Mr. Madrigal refrain from discussing the facts of this case with anyone other than his legal counsel to protect his right against self-incrimination.

These are not superfluous advisements: consular protection officers have observed that many Mexican nationals either do not comprehend or do not trust in their right to remain silent and their right to have an attorney present during the interrogation when advised of those rights solely by the arresting police. Even Mexican nationals who have resided in the United States for many years are often confused by its judicial procedures, and many, like Mr. Madrigal do not speak English fluently. Some detained Mexicans may agree to waive their legal rights out of fear that a failure to cooperate with their interrogators will result in more severe punishment or will jeopardize their immigration status in the United States.

Consular protection officers immediately advise Mexican nationals of their rights in terms that are familiar to them, while verifying both that they understand the significance of those rights within the U.S. legal process and that they are not subjected to any form of intimidation, inducement or deception. Exhibit A, Affidavit of the Mexican Consulate. If consular contact had been permitted at any time prior to his statement to the authorities, Mr. Madrigal would have acted on this advice.

Consistent with their standard practice in such cases, had the proper authorities notified Mexican consular officers without delay of Mr. Madrigal's detention, consular officers would have explained to Mr. Madrigal his rights under the U.S. legal system and clarified how the U.S. judicial process differs from that of Mexico. This explanation would have included a detailed review of Miranda warnings to ensure that he could make a knowing, intelligent, and voluntary waiver of his rights. The Consulate would have further clarified that regardless of his financial situation, he had the right to an attorney, and a right for that attorney to be present during questioning. Mr. Madrigal would have been advised that no adverse consequences would result from exercising these rights. Had the Department of Homeland Security refused immediate consular access to Mr. Madrigal, the Consulate would have acted on its treaty rights by promptly arranging for the presence of an attorney during his interrogation. See VCCR art. 36 (1) (c) (sovereign right of consulate "to arrange for [a detained national's] legal representation"); id. art. 5(i) (consular functions include "arranging appropriate representation for nationals of the sending State…for the preservation of the rights and interests of these nationals"); see also Exhibit A, Affidavit of Mexican Consulate (outlining forms of assistance that would have been provided immediately to Mr. Madrigal).

The consular assistance that Mexico provides is particularly far-reaching in cases where a defendant is facing potentially capital charges: "[T]he protection of Mexican nationals who face capital proceedings or capital trials is one of the highest priority [sic] of the Mexican Consular representatives. All their efforts are focused on trying to avoid the imposition of the death penalty." *Torres v. State*, 120 P.3d 1184, 1188 (Okla. Crim. App. 2005) (internal quotations omitted). As in all other instances in which the death penalty was a possible outcome, "the Government of Mexico would have intervened in the case, assisted with Petitioner's defense, and provided resources to ensure that he received a fair trial and sentencing hearing." *Valdez v. State*, 46 P.3d 703, 710 (Okla. Crim. App. 2002). See also CONSULAR NOTIFICATION AND ACCESS 26 (encouraging police to comply with Mexico's "desire to be notified

of the detention of any…person who is charged with a crime that could result in capital punishment… even if the individual does not request notification").

One need only look to the subsequent record of consular involvement in this case to confirm that Mexico would have played an instrumental role in the proceedings from the very earliest opportunity, had it not been for the failure of the competent authorities to comply with the binding requirements of Article 36. That Mr. Madrigal may have waived his Miranda rights does not absolve the state of its failure to meet its treaty obligations, nor does the alleged waiver establish that the denial of consular rights is irrelevant to the involuntariness inquiry. The failure to notify the Consulate in this case constitutes a violation of Mr. Madrigal's rights under the VCCR. This breach undermined his ability to make informed legal decisions and to receive timely assistance from his government. As such, this Court should recognize the prejudicial effect of this violation and take appropriate remedial action to uphold the fundamental rights guaranteed under international law.

## **CONCLUSION**

For the foregoing reasons, Mr. Madrigal's statement must be suppressed as his Miranda waiver was not knowing, intelligent and voluntary. For the reasons stated above, the defendant, Benjamin Madrigal, respectfully requests that this Court grant the above-requested motions.

Dated: March 28, 2025.                    /s/ *Michael Anthony Hernandez*
                                          Jason T. Conforti and Michael Anthony Hernandez
                                          Attorneys for Benjamin Madrigal